IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**ROSE McAVOY**,                )
                                )
    Plaintiff,              )
                                )
  v.                            )   1:20cv1327
                                )   **Electronic Filing**
**DICKINSON COLLEGE**           )
                                )
    Defendant.              )

## OPINION

In the fall of 2017, Rose McAvoy ("plaintiff") was sexually assaulted while attending Dickinson College ("defendant") as a residential student. Plaintiff maintains that defendant failed to respond adequately to her report of being sexually assaulted. On the basis of defendant's response, plaintiff brought this action for Title IX discrimination and breach of contract claims.[1] Presently before the court is defendant's motion for summary judgment. For the reasons set forth below, the motion will be granted.

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(A). Rule 56 "'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322–

---

[1] By Order of Court dated September 21, 2021, this court dismissed plaintiff's negligence claim at Count III of the Amended Complaint (Doc. No. 35).

23 (1986)). Deciding a summary judgment motion requires the court to view the facts, draw all reasonable inferences and resolve all doubts in favor of the nonmoving party. Doe v. Cnty. of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001).

The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. When the movant does not bear the burden of proof on the claim, the movant's initial burden may be met by demonstrating the lack of record evidence to support the opponent's claim. Nat'l State Bank v. Fed. Reserve Bank of New York, 979 F.2d 1579, 1581-82 (3d Cir. 1992). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a *genuine issue for trial*," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(E)) (emphasis in Matsushita). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" . . . "and cannot simply reassert factually unsupported allegations." Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989). Nor can the opponent "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs." Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992); Sec. & Exch. Comm'n v. Bonastia, 614 F.2d 908, 914 (3d Cir. 1980) ("[L]egal conclusions, unsupported by documentation of specific facts, are insufficient to create issues of material fact that would preclude summary judgment.").

Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion. Robertson v. Allied Signal, Inc., 914 F.2d 360, 382-83 n.12 (3d Cir. 1990). If the non-moving party's evidence is merely colorable or lacks sufficient probative force summary judgment may be granted. Anderson, 477 U.S. at 249-50; see also Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993) (although the court is not permitted to weigh facts or competing inferences, it is no longer required to "turn a blind eye" to the weight of the evidence).

The record as read in the light most favorable to plaintiff establishes the background set forth below. Plaintiff was a student at Dickinson College during the 2017-2018 academic year. Defendant is a private liberal arts college located in Carlisle, Pennsylvania. The parties do not dispute that defendant receives federal funding and is subject to Title IX of the Education Acts of 1972, 20 U.S.C. § 1681.

On or about October 30, 2017, plaintiff was sexually assaulted on campus by a male student, Thomas Schmitz ("Schmitz"), who kissed her and grabbed her breasts after she indicated she did not consent to the sexual contact ("the sexual assault"). Plaintiff reported the sexual assault the next day to one of her professors. The professor reported plaintiff's assault to defendant's Title IX Office later that day.

The next morning, one of defendant's employees emailed plaintiff "to check on her." The email (1) invited plaintiff to meet with one of defendant's employees to learn about the various resources available to her; (2) notified her of her right to have an advisor or advocate assist her throughout any initiated process; and (3) provided her with information about the various resources, supports, and options available to her, including a link to defendant's Title

IX policy.

On November 7, 2017, seven days after plaintiff reported the assault to a professor, plaintiff met with defendant's Title IX Coordinator, Dean Bylander ("Bylander"), to give an account of what occurred during the sexual assault. Plaintiff did not identify her assailant by name at that time. During the meeting, Bylander presented plaintiff with several ways by which defendant could respond to the sexual assault, offered her academic supports, and advised her of the resources available to her as a victim of sexual assault. At that moment in time, plaintiff was unsure whether she wanted defendant to initiate an investigation into Schmitz's conduct.

Also on November 7, 2017, Schmitz texted plaintiff to ask whether they were "good" and whether she was avoiding him. When he did not receive a response from plaintiff, he sent a final text on November 8 which read, "ok, message received. im sorry for what i did to offend you." On December 6 or 7, 2017, plaintiff disclosed these texts to Bylander.

On November 9, 2017, Bylander sent a letter to plaintiff inviting her to contact Bylander if she needed anything. The letter included a list of resources and rights available to plaintiff, including the right to receive interim protective and/or corrective measures and counseling at defendant's Wellness Center.

In the weeks and months following their initial meeting, Bylander assisted plaintiff in obtaining multiple academic accommodations. Each of these were at plaintiff's request. In one particular instance, plaintiff sought Bylander's help to obtain academic accommodations in the form of assignment and/or exam deadline extensions from Professor Yang ("Yang"), her Chinese language professor. Yang told Plaintiff she "needed to figure out how to get over [the sexual assault] so that she could do school." Yang also made comments to the class about

plaintiff's class attendance and late assignments. Plaintiff became uncomfortable with Yang after these comments and decided to start attending class when Yang's assistant was teaching. As a result of these comments, plaintiff acknowledges that she "looked into reporting [Yang]" and was told by her advisor, Joshua Eisenberg ("Eisenberg"), that she was able to report her. Plaintiff ultimately decided not to do so.

Despite Yang's comments, plaintiff admits that Yang "tried to be nice and accommodating" and granted the requested accommodations even before Bylander became involved. Ultimately, Bylander helped plaintiff successfully reschedule and complete the midterm exam for her Chinese class. Plaintiff later dropped the class.

Throughout the Title IX interactive process, Bylander advised plaintiff that she could "decide how this [process] moves forward" and asked plaintiff to consider what measures or actions would allow plaintiff to "feel able to put [the assault] aside . . . ." In addition to Bylander's assistance, defendant's other employees repeatedly offered both their personal assistance and defendant's resources in order to support plaintiff throughout this difficult time.

On December 6, 2017, plaintiff met with Bylander, notified her of Schmitz's identity, and advised that she wanted defendant to initiate an investigation under defendant's Title IX policy. The next day, on December 7, 2017, defendant initiated an investigation into the sexual assault. Plaintiff and Schmitz were interviewed on December 8, 2017, and December 14, 2017, respectively.

On December 11, 2017, defendant issued no contact directives to both plaintiff and Schmitz, directing them to have no contact with one another and not to approach each other. These directives noted that "[t]here may be times when [no contact] is impossible or impracticable, such as when in the library, the cafeteria, or attending a college event." In those

circumstances, each party was directed to "avoid approaching, speaking to, or otherwise having contact" with the other party. The directives further specified that noncompliance could result in disciplinary measures, up to and including interim suspension, and instructed both parties to directly contact Bylander with any questions or concerns.

After the no contact directives went into place, plaintiff notified Eisenberg that she was seeing Schmitz daily on campus, including in the dining hall. Eisenberg informed plaintiff that defendant could put certain accommodations in place to avoid such situations, such as specific set times in which Schmitz and plaintiff would be permitted to eat in the dining hall. However, Eisenberg did not precisely explain how those types of accommodations would be implemented except he did explain that staff members of defendant's department of public safety would likely get involved if Schmitz refused to comply. Plaintiff does not remember whether she requested dining hall accommodations.

Along with her concerns surrounding the dining conditions, plaintiff also expressed her apprehensions to Eisenberg about having to encounter Schmitz at theater-related activities. Eisenberg expressed that it would be difficult to make accommodations regarding theater-related activities, but that it had been done before and defendant would have to make sure that plaintiff and Schmitz did not end up in the same shows together. Ultimately, plaintiff advised Eisenberg that she "should just handle it on [her] own" without the assistance of defendant or its staff.

Although plaintiff indicated she would handle it on her own, she decided to stay away from all theater events except the Play-in-a-Day event. During this theater event, which was organized and run by students, plaintiff sought and received an accommodation that she and Schmitz would not be placed in the same show.

While at the Play-in-a-Day event, plaintiff became aware that Schmitz was in attendance. Plaintiff did not advise campus security or anyone else in defendant's administration that Schmitz was present at this particular theater event.

In addition to seeing Schmitz in the dining hall and at the Play-in-a-Day event, plaintiff advised Eisenberg and Bylander that Schmitz regularly visited his friends who lived in the same dormitory as plaintiff. Other than remembering she informed them, plaintiff does not recall whether she asked for any interim measures to prevent Schmitz from visiting his friends.

In the Spring of 2018, although plaintiff was regularly seeing Schmitz at her dormitory, plaintiff submitted a request to remain in her current residence for the upcoming academic year. She wanted to continue residing in special interest housing for students interested in performing arts and submitted her application to a student who oversaw the particular house she was interested in. During this time, Schmitz also submitted a similar request for special interest housing. Both of their requests were approved, and plaintiff and Schmitz were assigned to live in the same building for the fall semester of 2018.

Once plaintiff became aware of the housing assignment issue, she informed Bylander and Eisenberg. Bylander responded later that day that she would look into the situation. On April 9, 2018, two weeks after being notified of the issue, Eisenberg advised plaintiff that the housing situation had been resolved after Schmitz offered to relocate to alternative housing.

In late April of 2018, investigators prepared the Final Investigative Report ("Report"). The Report was completed on May 1, 2018. After the Report was issued, defendant appointed a review panel to consider the Report and determine if Schmitz had violated its Title IX policy. The review panel convened on May 31, 2018, and issued its written decision on June 19, 2018, ultimately finding Schmitz responsible for sexual assault.

Pursuant to its Title IX policy, the parties were given until June 27, 2018, to submit information for the review panel to consider when determining what sanction to impose upon Schmitz. Less than one week later, defendant issued notice that the sanction would be one semester of probation. Schmitz and plaintiff both submitted appeals and were given time to respond to each other's appeal. Although plaintiff requested an extension of time to respond to Schmitz's appeal, it was denied by Katherine Matic, defendant's Title IX coordinator at the time, in order to "move the case along the timeline."

On July 18, 2018, defendant affirmed the finding that Schmitz had violated its Title IX policy, upheld the probation sanction, and added an additional sanction of mandatory education on its Title IX policy – the meaning of consent and the lack of consent. Schmitz withdrew from Dickinson College after the Spring 2018 semester and never returned. As a result of dropping classes during the Title IX investigation, plaintiff did not graduate until the Spring of 2020.

According to defendant's Title IX policy, the investigation through the determination and sanction phase should have been completed within 60 days. Nevertheless, the policy contemplated that the process could be extended for "good cause." Although the process took longer than 60 days, defendant did not specifically notify plaintiff of the reason for the delay. However, when plaintiff had questions regarding the status of the investigation, she reached out to Eisenberg who did provide an update to her on each occasion after checking with the Title IX Office.

Plaintiff is seeking (1) an order enjoining defendant from unlawful discrimination on the basis of sex, including the failure to address, prevent and/or remedy sexual harassment; (2) injunctive relief requiring defendant to redress its alleged violations of Title IX; (3) an award

8

of damages, including reimbursement of and repayment for all of plaintiff's tuition or related expenses; payment of plaintiff's expenses incurred as a consequence of the sexual assault; damages for deprivation of the equal access to the education benefits and opportunities provided by defendant; damages for past, present, and future emotional pain and suffering, ongoing and severe mental anguish, and loss of past, present, and future earnings and enjoyment of life; (4) punitive and/or exemplary damages; (5) statutory pre- and post-judgment interest on all sums awarded; (6) an award of costs and attorneys' fees; and (7) any other relief the court finds just and proper.

Defendant now seeks summary judgment on plaintiff's remaining claims.  It contends this is warranted on both the gender discrimination claim and hostile education environment claim under Title IX because plaintiff has insufficient evidence to permit a finding that defendant acted with deliberate indifference.  It also maintains that plaintiff's breach of contract claim fails because of her inability to establish causation of damages.

Plaintiff maintains that the record contains sufficient evidence to support findings that defendant acted with deliberate indifference and also breached the contract in a manner that caused damages. Thus, she contends that summary judgment is inappropriate.

Title IX states in part that "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a). Although Congress only provided for administrative enforcement of Title IX's prohibition against discrimination, the Supreme Court held in Cannon v. Univ. of Chi., 441 U.S. 677 (1979), that Title IX was also enforceable through an implied private cause of action.  Cannon, 441 U.S. at 717.  Thereafter, the Court held that monetary damages can be recovered in a private action

under Title IX.  Franklin v. Gwinnett County Public Schools, 503 U.S. 60, 76 (1992).

It is settled that under Title IX a funding recipient's deliberate indifference to sexual harassment of a student by another student can constitute sex discrimination.  Davis v. Monroe Cnty. Bd. Of Educ., 526 U.S 629, 643 (1999).  To establish a violation of Title IX based upon student-on-student harassment, a plaintiff must establish sexual harassment that is "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victims are effectively denied equal access to an institution's resources and opportunities."  Id. at 651.  Further, a funding recipient can only be liable for "deliberate indifference to known acts of peer sexual harassment," meaning an institution's "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances."  See Roe v. Pa. State Univ., 2019 U.S. Dist. LEXIS 24870, *13 (E.D. Pa. February 15, 2019) (quoting Davis, 526 U.S. at 648).

Accordingly, to prevail on a claim of student-on-student sexual harassment under Title IX here, a plaintiff must establish that: (1) the defendant receives federal funds; (2) sexual harassment occurred; (3) the harassment occurred under "circumstances wherein the recipient exercise[d] substantial control over both the harasser and the context in which the known harassment occur[red]," (4) the funding recipient had "actual knowledge" of the harassment; (5) the funding recipient was "deliberately indifferent" to the harassment; and (6) the harassment was "so severe, pervasive, and objectively offensive that it [could] be said to [have] deprive[d] the victims of access to the educational opportunities or benefits provided by the school."  Davis, 526 U.S. at 645, 650.

If defendant was in fact aware of the harassment, then the inquiry progresses to whether the school was "deliberately indifferent" toward the discriminatory conduct.  Davis, 526 U.S. at

10

645.  If an agent of a funding recipient does not participate in the harassment directly, the recipient cannot be liable unless its deliberate indifference "subjects" the student to harassment. Id.  Deliberate indifference further incorporates a causation requirement.  Id.  A defendant's actions or inactions must at a minimum "cause [a student] to undergo" harassment or "make [him or her] liable to or vulnerable" to it.  Id.

Here, it is undisputed that defendant receives federal financial assistant pursuant to Title IX and that sexual harassment occurred.  It is also clear that the harassment occurred under circumstances wherein defendant exercised substantial control over both the victim and the harasser.  Additionally, defendant had actual knowledge of the sexual assault because plaintiff reported the incident to a professor the next day, who immediately reported it to defendant's Title IX Office.  Defendant's Title IX Office contacted plaintiff the following day offering her various avenues of support, including the scheduling of a meeting with personnel.  Thus, there is sufficient evidence to support the first, second, third, and fourth elements.

Defendant challenges plaintiff's ability to make a showing sufficient to establish the existence of the fifth and sixth elements.  Defendant contends that plaintiff cannot specifically establish that it acted with deliberate indifference because its responses were reasonable, and plaintiff was not subjected to further sexual harassment that was severe, pervasive, and objectively offensive.

In response, plaintiff argues, among other things, that defendant acted with deliberate indifference because it purposefully prolonged the investigative process in violation of the 60-day timeline under defendant's Title IX policy.  In addition, she asserts that defendant received adequate notice of the sexual assault and should have done more in response to it.  And as a consequence, plaintiff was left vulnerable to further harassment and suffered emotional turmoil

11

and injury to her academic career due to defendant's actions and/or inactions.

Plaintiff's position that defendant's unilateral extension of the Title IX timeline supplies sufficient evidence of deliberate indifference is specious.  To support her claim of deliberate indifference, plaintiff highlights a number of procedural flaws in the investigative process, including that the total investigative process through the issuing of a final report took approximately 145 days, or approximately 85 days longer than prescribed by defendant's Title IX policy.  But to constitute deliberate indifference, the recipient's response to the harassment must be "clearly unreasonable in light of the known circumstances."  Davis, 526 U.S. at 648.  Deliberate indifference pertains to "an official decision [made by the school] not to remedy the violation."  Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998).  Courts look to the totality of the circumstances when determining deliberate indifference, and "deliberate indifference will often be a fact-based question, for which bright line rules are ill-suited."  Doe v. Manor Coll., 479 F. Supp. 3d 151, 162 (E.D. Pa. 2020) (quoting Doe ex rel. Doe v. Coventry Bd. of Educ., 630 F. Supp. 2d 226, 235 (D. Conn. 2009)).  The deliberate indifference "must [then], at a minimum, cause students to undergo harassment or make them liable or vulnerable to it."  Davis, 526 U.S. at 645.  Therefore, there can be no Title IX liability if a defendant responds to known harassment in a manner "that is not clearly unreasonable."  Id. at 648-49.

Plaintiff's dissatisfaction with the timeliness of the investigation does not in itself supply evidence that defendant's response was "clearly unreasonable."  Courts consistently have recognized that a victim's mere discontent with a school's investigation does not establish a Title IX violation.  See D.V. by and through B.V. v. Pennsauken School District, 247 F. Supp. 3d 464, 477 (D.N.J. 2017) (holding that when a school "attempts to investigate" an allegation of harassment, the plaintiff cannot establish "a Title IX violation occurred" simply by asserting that

he or she was "not satisfied with the ... investigation"); Karasek v. Regents of Univ. of California, 956 F.3d 1093, 1106–08 (9th Cir. 2020) (dismissing plaintiff's Title IX deliberate indifference claim despite the university defendant's thirteen-month delay in resolving a complaint of assault and failure to follow its policies and communicate with the plaintiff because the school "investigated [plaintiff's] complaint, met with her assailant shortly after she submitted her written report, and eventually imposed sanctions").  Thus, plaintiff's complaints concerning the delay in the investigative process do not carry significant weight in establishing sufficient evidence of deliberate indifference.

Plaintiff also argues that defendant was deliberately indifferent because it should have done more to protect her from Schmitz.  After the assault, plaintiff encountered Schmitz a number of times in her dormitory when he visited his friends, sporadically at the dining hall, and once at the Play-in-a-Day theater event.  Although defendant offered to impose additional restrictions, there is no evidence that plaintiff expressly directed defendant to take action to minimize or eliminate further contact after any of these events.  Plaintiff essentially contends that defendant had an obligation to unilaterally remove Schmitz from any location on campus where plaintiff might encounter him.  But the Supreme Court stated in Davis that a school district is not required to purge its schools of actionable peer harassment and that administrators are not required to engage in any particular disciplinary action. 526 U.S. at 648.  Victims of peer harassment do not have the right to request a particular remedial measure. Id.  Rather, a defendant "must merely respond to known peer harassment in a manner that is not clearly unreasonable." Id. at 649.

Here, the assault was immediately reported to the Title IX office after a professor became aware of plaintiff's allegations.  Defendant initiated an investigation one day after plaintiff

13

requested one and defendant's investigators started conducting interviews the following day. Additionally, defendant issued no contact directives to both plaintiff and Schmitz four days after the investigation began.

Throughout the Title IX process, defendant, through its staff, repeatedly offered various avenues of support and assistance to plaintiff.  Each time plaintiff was offered and accepted assistance from defendant's personnel, or asked for help, assistance was given.  And, ultimately, Schmitz was issued a sanction of one semester of probation and mandatory education on defendant's Title IX policy and the meaning of consent and the lack of consent.  Even though defendant implemented these measures, it was under no duty to take these actions, expel Schmitz, or take any other particular disciplinary action against him.  And it is clear under Davis that merely identifying instances where defendant was made aware of passing encounters on campus between the victim and the harasser does not suffice to establish a finding that a recipient's response was "clearly unreasonable."  The court is certainly sympathetic to what plaintiff experienced and acknowledges that defendant's timeline or responses to the sexual assault may not have been perfect.  Nevertheless, the mere indication that a defendant was aware of instances where the paths of the victim and harasser crossed following the implementation of a no contact order and took no further action thereafter on its own initiative is insufficient to support a finding that defendant's responses were "clearly unreasonable."

In short, drawing all inferences in the light most favorable to plaintiff, plaintiff has failed to establish a genuine dispute of material fact as to the deliberate indifference element of her Title IX claims.  Because plaintiff lacks sufficient evidence to support a finding that defendant was deliberately indifferent, defendant is entitled to summary judgment on plaintiff's Title IX claims.  Consequently, this court need not determine whether the identified instances of

14

discrimination or harassment rose to the level of being "severe, pervasive, and objectively offensive" and effectively barred her access to an educational opportunity or benefit. As a result, summary judgment will be granted in defendant's favor on Counts I and II.

Plaintiff likewise has failed to establish sufficient evidence to support her breach of contract claim. Count IV of plaintiff's complaint alleges defendant intentionally breached its implied and/or express contract with her due to its repeated failure to adhere to its own Title IX policies and procedures, causing plaintiff significant damages. Defendant asserts it is entitled to summary judgment on this count because plaintiff is unable to establish that any damages occurred due to the failure to complete the Title IX investigation within 60 days and/or to provide written notice of the reason(s) for the delay.

Its undisputed that defendant's Title IX policy indicated it would attempt to resolve all reports of sexual assault within 60 days. The policy provided:

> [defendant] will make every effort to successfully resolve all reports (through the imposition of sanction or final remedies) within 60 days. The time allotted for the appeal process is not included in the 60 days. In general, the Complainant and Respondent can expect that the process will proceed according to the time frames provided in this policy. However, any timeframe expressed in this policy, including the 60 days, may be extended for good cause with written notice to the parties of the delay and the reason for the delay. Good cause may exist for a variety of factors, including the complexity of the circumstances of each case, the integrity and completeness of the investigation, … to accommodate the availability of witnesses, to account for College breaks or vacations, or to address other legitimate reasons.

Title IX Policy, Doc. No. 67, App. A, at Ex. C, page 29. One day after plaintiff requested a Title IX investigation be opened into Schmitz, Bylander sent plaintiff a letter reiterating that

> [t]he College will make every effort *[sic]* complete the investigation and resolution process within 60 days but will balance this objective against the principles of thoroughness and fundamental fairness. We anticipate that there may be some delay in meeting the 60-day objective given that the beginning of this investigation comes just as we are about to close for winter break.

> We will, of course, let you know how the timing of the investigation is progressing as the 60 day mark draws near.

Letter of December 7, 2017, Doc. No. 67, App. A, at Ex. A, page 1 ("Bylander's Letter").

Under Pennsylvania law, the relationship between a private university and a student is contractual, the contract being comprised of the written guidelines, policies, and procedures as contained in the written materials distributed to the student over the course of his or her enrollment in the institution. See David v. Neumann Univ., 187 F. Supp. 3d 554, 558 (E.D. Pa. 2016) (citing Swartley v. Hoffner, 734 A.2d 915, 919 (Pa. Super. 1999)). A claim for breach of contract by a student against a university requires: "(1) the existence of a contract and its terms; (2) a breach of the duty imposed by the contract; and (3) damages that resulted." Furey v. Temple University, 730 F. Supp. 2d 380, 400 (E.D. Pa. 2010) (citing CoreStates Bank v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. 1999)); accord McShea v. City of Philadelphia, 995 A.2d 334, 340 (Pa. 2010).

While Pennsylvania law allows a student to sue a private university for breach of contract, "the allegations must relate to a specific and identifiable promise that the school failed to honor." See Vurimindi v. Fuqua Sch. of Bus., 435 Fed. Appx. 129, 133 (3d Cir. 2011). As such, the student "must point to specific undertakings in the [contract] that were not provided." See Miller v. Thomas Jefferson Univ. Hosp., 908 F. Supp. 2d 639, 655 (E.D. Pa. 2012); see also Bradshaw v. Pa. State Univ., 2011 U.S. Dist. LEXIS 36988, at *4 (E.D. Pa. Apr. 5, 2011) (dismissing breach of contract claim against university where the complaint failed to identify the handbook provisions allegedly violated with specificity).

The parties do not question that a contract exists between them. Additionally, the parties do not factually dispute that (1) the policy prescribed a 60-day timeline to resolve most sexual misconduct reports (through the imposition of a sanction); (2) the investigation of plaintiff's

16

complaint, through the issuance of a sanction, took six months instead of 60 days; (3) the policy permitted the investigative process to take longer than 60 days for good cause, but required defendant to provide *written* notice to the parties of the delay and the reason for it; and (4) other than the policy itself and Bylander's Letter, plaintiff did not receive any additional *written* notice indicating that the investigation could or was expected to take longer than 60 days or the reason for any delay.

Defendant does not dispute that the investigation exceeded the 60-day limit or that it failed to provide written notice once that occurred. It does, however, dispute that these breaches caused plaintiff to suffer damages.

In contrast, plaintiff cannot dispute that she received notice at various stages throughout the investigative process.[2] She merely highlights that she did not receive written notice as described in the Title IX policy and posits that her exposure to harassment was ongoing throughout the investigation, resulting in ongoing damages.

Plaintiff lacks sufficient evidence to show that these breaches actually resulted in damages. First, the record is clear that plaintiff consistently was kept abreast of the progression of the investigation. She admits that when she had questions about the status of the investigation, she reached out to Eisenberg and he provided an update after checking with the Title IX Office.

Second, plaintiff received written notice that the investigative process could be extended via defendant's Title IX policy and Bylander's Letter. The Title IX policy stated that

---

[2] See Plaintiff's Combined Response in Opposition to Defendant's Statement of Undisputed Facts and Statement of Additional Material Facts (Doc. No. 73, ¶ 63) (listing the numerous times at which plaintiff received notice of the investigative process – to which plaintiff responded "[u]ndecided"). Given this response, under our local rules the concise statements of fact identifying these instances of verbal notice are deemed admitted. See LCvR 56.E.

"[defendant] [would] make every effort to successfully resolve all reports . . . within 60 days" but further provided that "any timeframe expressed in this policy . . . can be extended for good cause . . . " and "[g]ood cause may exist for a variety of factors . . . ."  Bylander's Letter also gave advance notice that defendant "anticipate[d] that there may be some delay in meeting the 60-day objective . . . as we are about to close for winter break . . . ."  Thus, plaintiff received written notice at the beginning of the investigation that the process would likely take longer than 60 days.

Third, plaintiff was provided with updates throughout the investigative process as to the status of her case.  Nevertheless, plaintiff argues that she suffered damages because she repeatedly saw Schmitz on campus (i.e., a number of times in her dormitory when he visited his friends, sporadically at the dining hall, and once at the Play-in-a-Day theater event) and suffered academically because she was forced to delay graduation until the Spring of 2020.

Against this backdrop, plaintiff has failed to identify sufficient evidence to support a finding that the extension of the investigation and the failure to provide written notice thereof actually caused her to suffer damages.  To recover for damages under a breach of contract claim, the plaintiff must be able to establish a causal connection between the defendant's actions and the resultant damages.  See Enslin v. Coca-Cola Co., 739 Fed. Appx. 91, 95 (3d Cir. 2018) (citing Logan v. Mirror Printing Co. of Altoona, PA, 600 A.2d 225, 226 (Pa. Super. 1991)).

As stated above, defendant ultimately issued a sanction of one semester of probation to Schmitz along with mandatory education on the need for consent.  Even if these sanctions were imposed earlier, there is neither evidence that they would have eliminated plaintiff's post-assault encounters with Schmitz nor a competent basis to so assume.  As a result, even if the investigation had been conducted within the allotted 60-day timeframe, or even if plaintiff would

18

have received a written explanation for the delay, she would still have encountered Schmitz on campus and would still have been confronting the same set of circumstances that assertedly delayed her graduation. And, as also addressed above, defendant was under no Title IX/contractual duty to expel Schmitz or take any other particular disciplinary action against him. Given these circumstances, plaintiff's complaints about the form of notice and information received about the ongoing progression of the investigation cannot support a finding that defendant's breach caused plaintiff's claimed damages. Therefore, summary judgment will also be granted in favor of defendant as to Count IV.

For the reasons set forth above, defendant's motion for summary judgment will be granted. An appropriate order will follow.

Date: September 26, 2023

s/David Stewart Cercone
David Stewart Cercone
Senior United States District Judge

cc:     Andrew T. Miltenberg, Esquire
        Gabrielle M. Vinci, Esquire
        Kevin D. Rauch, Esquire
        Kimberly Marie Colonna, Esquire

        *(Via CM/ECF Electronic Mail)*